J-S40013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                :  PENNSYLVANIA
                                :
             v.                 :
                                :
                                :
AMIR DUSON-CARTER  :
                                :
            Appellant     :  No. 1317 EDA 2019

Appeal from the Judgment of Sentence Entered December 17, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004846-2017

BEFORE:  SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:  **FILED DECEMBER 09, 2020**

Appellant, Amir Duson-Carter, appeals from the judgment of sentence entered December 17, 2018, following his conviction by a jury of one count each of first-degree murder, carrying a firearm on a public street in Philadelphia, carrying a firearm without a license, and possession of an instrument of crime ("PIC").[1]  We affirm.

The trial court summarized the facts of the case, as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia [P]olice [O]fficers Henry Simmons, David Dohan, Michael Maresca, Norman DeFields, and Keith Samarco, Philadelphia [P]olice [D]etectives Jamal Rodriguez, Thorsten Lucke, James Dunlap, and John Harkins, Philadelphia [P]olice [F]orensic [S]cientist Andrea Williams, Philadelphia [A]ssistant [M]edical [E]xaminer Dr. Lindsay Simon, and Cedric Council.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 6108, 6106, and 907, respectively.

[Appellant] presented the character testimony of Courtnay Robinson, Atiyah Rahman-Anderson, and Mark Voce. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On the evening of March 18, 2017, Cedric Council made arrangements to purchase marijuana from [Appellant] and to have [Appellant] bring it to Council's mother's house, where Council was staying. However, because [Appellant] took too long to show up at the house, Council eventually made other arrangements to acquire marijuana. Council then decided to walk to a store at 6400 Stenton Avenue near the corner of Stenton Avenue and Johnson Street. As he was walking to the store, [Appellant] pulled up next to Council in a white Toyota Corolla along with two passengers. [Appellant] asked Council if he still wanted to buy marijuana. Council told [Appellant] he did not want to buy marijuana and that he was walking to the corner store. [Appellant] then offered Council a ride to the store, which Council accepted. [Appellant] dropped Council off at the store and waited for him in the car. Council made a purchase, left the store, and then got back into the driver's side backseat of [Appellant's] car so that [Appellant] could give him a ride home. [Appellant] then pulled away and made a U-turn on Stenton Avenue that placed him in a small parking area that ran parallel to Stenton Avenue.

As [Appellant] was making the U-Turn, the decedent, Haneef Brown [("the victim")], walked in front of [Appellant's] car. [Appellant] stopped his vehicle and [the victim] said something to [Appellant]. In response, [Appellant] rolled down his window and both men said "What's up?" to each other. The two men had a brief conversation, during which [the victim] was pacing back and forth in front of the driver's window and seemed agitated. Then [Appellant], who was still sitting in the driver's seat of his car, shot [the victim] four times. After shooting [the victim, Appellant] drove away and, shortly thereafter, dropped Council off at his house. Officers responding to the shooting rushed [the victim] to the hospital where he was pronounced dead thereafter.

Philadelphia police officers and detectives then conducted an investigation of the shooting. Officers recovered two 9 mm Luger fired cartridge casings ("FCCs") from the crime scene. Officers also recovered surveillance video from several businesses in the area. On the same night as the murder, an officer reviewed the surveillance video from the corner store on Stenton Avenue

and Johnson Street in hopes of identifying a suspect. The officer noticed a man in the store stare right into the surveillance camera, leave the store, and then enter a white sedan, which pulled away and made a U-turn. That man was later identified as Council. On March 20, 2017, detectives obtained a search warrant for Council's cell phone records and brought him to the Homicide Unit at 750 Race Street for questioning. The next day, Council gave a written statement to detectives wherein he admitted that he was in the white Toyota when [the victim] was shot, identified the driver of the vehicle as "Mir," and stated that while he had heard the sound of a gun firing multiple times, he did not see who shot [the victim].

On April 5, 2017, detectives brought Council back to the Homicide Unit for a follow-up interview. Council gave another statement to detectives in which he admitted that his previous statement was not entirely truthful. Council informed detectives that he witnessed "Mir" shoot [the victim] and that "Mir" lived on Tulpehocken Street. Using this information, detectives searched a police database that contained residents of Tulpehocken Street and obtained a photograph of [Appellant]. Council subsequently identified [Appellant] from the photograph as "Mir," the man who shot and killed [the victim].

Based on this information, detectives secured a search warrant for 31 East Tulpehocken Street, which [Appellant] had listed as his address on his driver's license. Detectives also discovered that the property was owned by Amber Carter, who is [Appellant's] mother. Upon executing the search warrant, detectives searched a bedroom in [Appellant's] apartment and recovered [Appellant's] driver's license, a small amount of marijuana, a significant amount of drug paraphernalia that is commonly used to package illegal drugs for distribution, a spent .40 caliber FCC, and a full box of 9 mm Luger bullets. The box of 9 mm Luger bullets had the same head stamp as the two 9 mm Luger FCCs recovered at the crime scene.

Detectives also discovered a white 2007 Toyota Corolla parked outside of the residence that was registered to [Appellant's] mother and towed it to a police garage. Police records indicated that [Appellant] was stopped as the driver in that vehicle several times in the months preceding the murder. Upon inspection, detectives discovered a 9 mm Luger FCC in the gap of the vehicle between the rear window and the trunk.

On May 10, 2017, officers observed a man named Anthony Spellman attempt to shoot three males who were running away from him. Spellman, however, was unable to fire the gun and the magazine fell out as he attempted to pull the trigger. Officers then arrested Spellman and confiscated the firearm. The Firearms Identification Unit later determined that the two FCCs recovered from the crime scene and the FCC recovered from [Appellant's] vehicle were all fired from that firearm. GPS tracking data from Spellman's cellphone showed that he was moving in tandem with [Appellant] on the night of the murder.

Trial Court Opinion, 8/16/19, at 2–5 (internal citations to the record omitted).

Appellant was arrested on June 7, 2017, and charged with murder and related offenses. Following a jury trial, Appellant was found guilty of the above-described charges. The trial court sentenced Appellant to life imprisonment for first-degree murder and imposed no further penalty on the remaining counts of conviction. Trial counsel filed timely, boilerplate post-sentence motions. Appellant obtained new, present counsel, who filed supplemental post-sentence motions, which the trial court denied on April 18, 2019. Appellant filed a notice of appeal.[2] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal, which we have reordered for ease of disposition:

_____

[2] Appellant filed his notice of appeal to this Court from the denial of post-sentence motions on April 18, 2019. Notice of Appeal, 5/3/19. In a criminal action, the appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions. *Commonwealth v. Kuykendall*, 2 A.3d 559, 560 n.1 (Pa. Super. 2010). Therefore, we have amended the caption accordingly.

- 4 -

A. Did the court below err in denying a post sentence motion to set aside the ve[r]dict where the evidence was insuffic[i]ent as a matter of law?

B. Did the court below err in denying a post senten[c]e motion where the verdict was against the weight of the evidence?

C. Did the court below err in denying the motion to suppress where the search warrant failed to state with particularity the place to be searched?

D. Did the court below err in denying post sentence motion seeking a new trial where the verdict was called into question due to prosecutorial misconduct in the prosecutor's closing?

Appellant's Brief at 6 (full capitalization omitted).

When an appellant raises both a sufficiency-of-the-evidence issue and a suppression issue, we address the sufficiency of the evidence supporting the conviction first, and we do so without a diminished record:

> We are called upon to consider all of the testimony that was presented to the jury during the trial, without consideration as to the **admissibility of that evidence**. The question of sufficiency is not assessed upon a diminished record. Where improperly admitted evidence has been allowed to be considered by the jury, its subsequent deletion does not justify a finding of insufficient evidence. The remedy in such a case is the grant of a new trial.

*Commonwealth v. Stanford*, 863 A.2d 428, 431–432 (Pa. 2004) (emphasis in original).

In reviewing a sufficiency challenge, "we must decide whether the evidence admitted at trial, and all reasonable inferences drawn therefrom in favor of the Commonwealth, as verdict winner," are sufficient to support all elements of the offense. *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa.

2015). The jury, as fact-finder, is free to believe some, all, or none of the evidence. *Commonwealth v. Gomez*, 224 A.3d 1095, 109 (Pa. Super. 2019). Moreover, the Commonwealth may sustain its burden of proof by wholly circumstantial evidence. *Commonwealth v. Diggs*, 949 A.2d 873 (Pa. 2008); *Commonwealth v. Vogelsong*, 90 A.3d 717 (Pa. Super. 2014). As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994 (Pa. Super. 2015).

In making his argument, Appellant concedes that "the evidence that the fatal shots were fired from the white Toyota is virtually unassailable." Appellant's Brief at 24. He also acknowledges that "[o]ne may even conclude from the totality of the evidence that [he] was operating that vehicle." *Id.* Appellant disputes only that he was the person who shot the victim. Appellant's Brief at 25.

Appellant attempts to assail Mr. Council's identification of Appellant as the shooter, but Appellant wholly fails to direct us to any testimony in the record. Appellant's Brief at 24–25. Appellant refers to various statements by Mr. Council without any citation to their admission in the record. *Id.* at 24. "It is not this Court's responsibility to comb through the record seeking the factual underpinnings of an appellant's claim." *Commonwealth v. Samuel*, 102 A.3d 1001, 1005 (Pa. Super. 2014). Despite the lack of references to the

record, we address the issue and rely upon the trial court's thorough response

to the claim, as follows:

> Here, [Appellant] argues that Council's statement to detectives in which he identified [Appellant] as the person who shot and killed [the victim] was legally insufficient to sustain the verdict because it was unreliable and not corroborated by other evidence. Statement of Matters at pp. 2-3. On March 21, 2017, Council provided a written statement to detectives in which he admitted that he was in the white Toyota when [the victim] was shot, identified the driver of the vehicle only as "Mir," and stated that while he heard the sound of a gun firing, he did not see who shot [the victim]. *See* N.T. 12/11/2018 at 151-160, 168; Commonwealth Exhibit C-14. Later, on April 5, 2017, Council provided another statement to detectives in which he admitted that his previous statement was not entirely truthful. *See* N.T. 12/11/2018 at 186-87; N.T. 12/13/2018 at 93-94; Commonwealth Exhibit C-19. Council identified [Appellant] as the man who was driving the white Toyota Corolla and as the man who shot and killed [the victim]. *See* N.T. 12/11/2018 at 190, 196-97. Then, on June 1, 2017, Council provided a statement to [Appellant's] investigator, in which he stated that he "heard two to three pops," that he did not know that the "pops" were gunshots and that, after he heard the "pops," he saw [the victim] "walking away normally crossing Stenton [Avenue]." N.T. 12/11/2018 at 214, 223-25; Commonwealth Exhibit C-24.

> At trial, Council recanted his statement to police that [Appellant] shot [the victim] and claimed that he did not hear the sound of any gun firing and that none of the occupants of the vehicle shot [the victim]. N.T. 12/11/2018 at 129-132. Council's three signed statements were admitted at trial during his testimony. The statements to police were admissible for their truth as prior inconsistent statements that were signed and adopted by the declarant. *See* Pa.R.E.803.1(1)(b). It is well-established that where a witness at trial recants a statement he made to police, the fact-finder is "free to evaluate both the [witness's] statement to police as well as his testimony at trial recanting that statement, and [is] free to believe all, part, or none of the evidence." *Commonwealth v. Hanible*, 836 A.2d 36, 40 (Pa. 2003). Such recantations are "notoriously unreliable," *Commonwealth v. Johnson*, 966 A.2d 523, 541 (Pa. 2009), and "the mere fact that the only eyewitness recanted a statement he

- 7 -

had previously made to the police certainly does not render the evidence insufficient to support the conviction." *Hanible*, 836 A.2d at 40. Moreover, a conviction may rest entirely on prior inconsistent statements of witnesses who testify at trial, and such statements "must...be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction." *Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa. 2012).

Accordingly, Council's out-of-court statements to police, in which he gave a detailed rendition of the incident here at issue, were legally sufficient to establish [Appellant] as the shooter, notwithstanding Council's recantation. Moreover, Council's statements to the police identifying [Appellant] as the shooter were corroborated by compelling evidence.

First, the Commonwealth presented surveillance footage recovered by police that corroborated much of the narrative Council presented in his statements. Surveillance video showed an individual exit from the rear driver's side door of a white sedan and enter a store near the corner of Stenton Avenue and Johnson Street. *See* N.T. 12/12/2018 at 190; Commonwealth Exhibit C-68 (compilation video). The video then showed the man exit the store, and get back into the driver's side backseat of the car. *See* N.T. 12/12/2018 at 190-91; Commonwealth Exhibit C-68. Next, video showed that as the driver of the car pulled away and made a U-turn on Stenton Avenue, a man walked in front of the vehicle. *See* N.T. 12/12/2018 at 191-93; Commonwealth Exhibit C-68. Video also showed the man and the driver have a brief exchange, and then gunfire, whereafter, the man outside the door collapsed. *See* N.T. 12/12/2018 at 193-94; Commonwealth Exhibit C-68. Council's detailed rendition of the events was fully consistent with the video evidence.

Next, Council's statements provided information to detectives about [Appellant] that was both previously unknown to police and accurate. In his second statement to detectives, Council stated that the shooter, whom he identified only as "Mir," lived on Tulpehocken Street, and Council provided detectives with "Mir's" phone number. *See* N.T. 12/11/2018 at 190, 194; N.T. 12/13/2018 at 97-98, 104; Commonwealth Exhibit C-19. Detective Harkins testified that based on this information, detectives searched a police database that contained residents of

Tulpehocken Street, procured a photograph of [Appellant], and showed it to Council, who identified [Appellant] as "Mir," the man who shot and killed [the victim]. N.T. 12/13/2018 at 98; *see* Commonwealth Exhibit C-19. Further, Detective Rodriguez testified that [Appellant] listed 31 Tulpehocken Street as his address on his driver's license. N.T. 12/12/2018 at 123-24. Finally, Detective Rodriguez testified that, after [Appellant's] arrest, [Appellant] gave him his phone number, which was the same phone number Council identified as [Appellant's] number to detectives. N.T. 12/12/2018 at 135-36.

Moreover, evidence seized from [Appellant's] apartment corroborated Council's assertion that [Appellant] sold marijuana. *See* N.T. 12/11/2018 at 196; Commonwealth Exhibit C-19. Detective John Harkins testified that while executing a search warrant on [Appellant's] apartment, police found a small amount of marijuana and a considerable amount of packaging that is commonly used to package illegal drugs for distribution. N.T. 12/13/2018 at 97, 110.

In addition, there was substantial evidence to substantiate Council's assertion that [Appellant] was driving the vehicle, depicted in the surveillance video, from where the gunshots that killed [the victim] were fired. Cell site location analysis demonstrated that [Appellant's] cellphone was located in the area of where the shooting occurred at the time the shooting occurred. *See* N.T. 12/13/2018 at 158-59. Detective Jamal Rodriguez testified that after conducting the search of [Appellant's] dwelling, he discovered a white Toyota Corolla parked outside that was registered to [Appellant's] mother, Amber Carter. N.T. 12/12/2018 at 129. Detective Rodriguez also testified that police records indicated that [Appellant] was stopped as the driver in that vehicle five times in the months preceding the murder, including twice in the month before the murder occurred. N.T. 12/12/2018 at 130-34. Further, Andrea Williams, a forensic scientist for the Philadelphia police department, whom the [c]ourt accepted as an expert in fingerprint identification, testified that an analysis of a palm print recovered from the driver's side front roof rail of the vehicle was determined to belong to [Appellant]. N.T. 12/13/2018 at 62.

In addition, there was no doubt that the white Toyota Corolla was the vehicle from which the gunshots were fired. In the surveillance footage, the vehicle from which the shots were

fired from was missing its hubcaps. *See* N.T. 12/12/2018 at 86-87; Commonwealth Exhibit C-68. The vehicle detectives found outside [Appellant's] home also had no hubcaps. *See* N.T. 12/12/2018 at 58. Further, Officer Michael Maresca testified that he recovered a 9 mm FCC in the gap of the vehicle between the rear window and the trunk. N.T. 12/12/2018 at 60-61. Officer Norman DeFields from the Firearms Identification Unit confirmed that the FCC, along with the two FCCs recovered from the crime scene and the bullet found in [the victim's] abdomen, were all fired from the same firearm. N.T. 12/13/2018 at 32.

Moreover, the evidence demonstrated that the driver of the vehicle shot and killed the decedent. The surveillance footage combined with the ballistic evidence established that the gunshots came from a gun being held outside of the driver's window. Surveillance video clearly showed that the gunshots that killed [the victim] came from the area around the driver's window. *See* N.T. 12/12/2018 at 193-94; Commonwealth Exhibit C-68. In the video, two flashes of light can be seen outside the vehicle before [the victim], who was standing in front of the driver's window, collapsed. *Id*. Detective Thorsten Lucke testified that those two flashes were muzzle flashes. N.T. 12/12/2018 at 194-196. Officer DeFields explained that muzzle flash is the flash that can be seen as a bullet is exiting the barrel of a firearm. N.T. 12/13/2018 at 38-39. He further explained that muzzle flash occurs right at the barrel of a firearm; therefore, if the gun was fired from inside the car, then muzzle flash would not have been visible outside of the car. N.T. 12/13/2018 at 39-40. Officer DeFields also testified that if the gun was fired from inside the car, the FCCs would be expected to land inside the vehicle. N.T. 12/13/2018 at 46. Three FCCs were recovered outside of the vehicle. *See* N.T. 12/12/2018 at 45, 60. Accordingly, it would have been extremely difficult for anyone but the driver to have shot [the victim] from anywhere in the vehicle other than the driver's seat.

The evidence seized from [Appellant's] apartment also substantiated that [Appellant] was the shooter. The full box of bullets that officers discovered in [Appellant's] room when executing a search warrant of his dwelling were consistent with the two FCCs recovered from the crime scene, the FCC recovered from in between the rear window and the trunk of the Toyota Corolla, and the bullet found in [the victim's] abdomen. *See* N.T. 12/13/2018 at 27-28, 41.

Finally, although cell phone site location analysis indicated that Anthony Spellman was located in the same areas as [Appellant] before, during, and after the shooting, N.T. 12/13/2018 at 165-66, and Spellman was arrested with the murder weapon, *see* N.T. 12/13/2018 at 32, 80-82, the evidence, described above, demonstrated that the driver of the vehicle was the shooter and that [Appellant] was the driver. In addition, the evidence showed that Spellman did not know how to operate the firearm that was used to kill [the victim]. Officer Keith Samarco testified that, before arresting Spellman, he observed him chase [three] males and attempt to shoot at them; however, he was unable to fire the gun and released the magazine as he attempted to pull the trigger. N.T. 12/13/2018 at 80. In addition, while the bullets seized from [Appellant's] room were consistent with the FCCs found at the crime scene and [the victim's] abdomen, Spellman was using different ammunition. *See* N.T. 12/13/2018 at 34-35.

Accordingly, the evidence was more than sufficient to enable the jury to find [Appellant] guilty of the crimes for which he was convicted. No relief is due.

Trial Court Opinion, 8/16/19, at 10–15 (footnotes omitted).

Next, Appellant argues his first-degree murder conviction is against the weight of the evidence. This claim assails the jury's underlying verdict and credibility determinations, as Appellant maintains that Mr. Council "was not to be believed" and "is as unreliable and as untrustworthy as they come." Appellant's Brief at 26. His argument lacks substantive support.

We have held that a motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict." **Commonwealth v. Rayner**, 153 A.3d 1049, 1054 (Pa. Super. 2016) (quoting **Commonwealth v. Widmer**,

744 A.2d 745, 751 (Pa. 2000)). Our Supreme Court has described the standard applied to a weight-of-the-evidence claim as follows:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

*Commonwealth v. Williams*, 176 A.3d 298, 312 (Pa. Super. 2017) (quoting *Commonwealth v. Cash*, 137 A.3d 1262, 1270 (Pa. 2016) (internal citations omitted)). A trial court's determination that a verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons" for denying a new trial. *Commonwealth v. Colon–Plaza*, 136 A.3d 521, 529 (Pa. Super. 2016) (quoting *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013)). A verdict is against the weight of the evidence where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting *Widmer*, 744 A.2d at 751–752). "[W]e do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence . . . . Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion." *Williams*, 176 A.3d at 312.

In rejecting Appellant's argument, the trial court acknowledged that the claim was solely premised on the credibility of Commonwealth witness Cedric Council. Trial Court Opinion, 8/16/19, at 16. The trial court stated that while it is true that Mr. Council recanted his statement to police that Appellant was the person who shot the victim, as noted in the trial court's explanation *supra* explaining the rational of its findings concerning the sufficiency of the evidence, "the Commonwealth presented compelling evidence that corroborated Council's statement and plainly established that [Appellant] was guilty of the crimes for which he was convicted." *Id.*

It is well settled that it is within the province of the jury to assess the credibility of witnesses, and a trial judge will not grant a new trial merely because of a conflict in the testimony or because he may have reached a different conclusion if he had been the trier of fact. *Commonwealth v. Vandivner*, 962 A.2d 1170, 1178 (Pa. 2009). Our review is not a reassessment of the weight of the evidence; it is for an abuse of discretion. *Cash*, 137 A.3d at 1270; *Commonwealth v. Ferguson*, 107 A.3d 206, 213 (Pa. Super. 2015). For the reasons set forth above, we discern no abuse of discretion in the trial court's denial of a new trial based on the weight of the evidence.

We next address Appellant's claim that the trial court erred in denying Appellant's motion to suppress based on his allegation that the search warrant

failed to state with particularity the place to be searched. Appellant's Brief at 20.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> We may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.
>
> ***Commonwealth v. Williams***, 2008 PA Super 6, 941 A.2d 14, 26–27 (Pa. Super. 2008) (*en banc*) (citations, quotations, and quotation marks omitted). Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony. ***See Commonwealth v. Clemens***, 2013 PA Super 85, 66 A.3d 373, 378 (Pa. Super. 2013).

***Commonwealth v. McCoy***, 154 A.3d 813, 815–816 (Pa. Super. 2017) (quoting ***Commonwealth v. Roberts***, 133 A.3d 759, 771 (Pa. Super. 2016)). "Furthermore, our Supreme Court in ***In the Interest of L.J.***, 622 Pa. 126, 79 A.3d 1073, 1085 (2013), clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing." ***McCoy***, 154 A.3d at 816.

Appellant contends the trial court erred by denying his motion to suppress the evidence found in his room because the search warrant "failed to state with particularity the place to be searched." Appellant's Brief at 20. He maintains that "this is not a case where the police acted in bad faith, rather

they acted on incomplete information." *Id.* Appellant contends that the warrant was invalid because it referred to the premises to be searched as 31 East Tulpehocken Street without further specification. N.T. (Suppression), 12/10/18, at 11.

The trial court resolved the issue as follows:

> Here, [Appellant] filed a motion to suppress all evidence seized from 31 East Tulpehocken Street, which is owned by [Appellant's] mother, Amber Carter. Police obtained a search warrant and conducted a full search of the property pursuant to that warrant. While the police's real estate record check prior to obtaining the warrant indicated that the property had been converted from a single unit building to a building with a separate apartment on each of its 3 floors, N.T. 12/10/2018 at 35-36; Defense Exhibit D-7, the warrant described the premises as "31 E. Tulpehocken Street, Phil., PA 19144, a three story dwelling." Commonwealth Exhibit C-20; *see* N.T. 12/10/2018 at 14. [Appellant] contends that since the property is a building with a separate apartment on each of its 3 floors, and because the police's real estate record check prior to obtaining a warrant informed the police of the separate dwellings, the warrant failed to describe with sufficient particularity [Appellant's] third floor apartment as the only place to be searched.
>
> For a search warrant to be valid, it "must describe the person or place to be searched with particularity." *Commonwealth v. Carlisle*, 534 A.2d 469, 471 (Pa. 1987); *see* Pa.R.Crim.P[]. 205(a)(3). "Normally, separate living units of a multiple tenant building must be treated as if they were separate dwelling houses and probable cause must be shown to search each one." *Commonwealth v. Copertino*, 224 A.2d 228, 230 (Pa. Super. 1966) (citation omitted); *see In re Interest of Wilks*, 613 A.2d 577, 579 (Pa. Super. 1992). However, "a warrant directing the search of more than one living unit may be valid if . . . there is cause to believe the premises covered by the warrant are being used as a single unit." *Copertino*, 224 A.2d at 230 (citation omitted). In such a situation, courts "essentially ignore the actual nature of the building and examine the warrant as if the building were occupied by a single tenant." *Commonwealth v. Waltson*, 703A.2d 518, 521 (Pa. Super. 1997) (citation omitted).

- 15 -

Here, the evidence presented at the pre-trial suppression hearing established that while officers may have known that the property was a building with an apartment on each of its 3 floors, they had cause to believe that 31 East Tulpehocken Street was being used as a single dwelling. Although the record check conducted by Detective Rodriguez indicated that the property was converted from a single unit building to a building with an apartment on each of its 3 floors, Detective Rodriguez testified that he did not know this and, at the time he obtained the warrant, he believed that the property was being used as a single dwelling. N.T. 12/10/2018 at 36. Detective Rodriguez further testified that this belief was based on review of numerous records in which [Appellant] and his mother, who owned the property, presented their address as 31 East Tulpehocken Street and did not include an apartment designation. N.T. 12/10/2018 at 11-14. [Appellant's] numerous arrest records and vehicle and pedestrian reports associated with [Appellant] revealed that [Appellant] provided authorities the above address without specifying an apartment number. N.T. 12/10/2018 at 11. Likewise, Detective Rodriguez discovered that when [Appellant] had been pulled over in a vehicle that was registered to [Appellant's] mother, the vehicle registration listed the same address without an apartment designation. N.T. 12/10/2018 at 12.

Moreover, when police arrived at the premises to execute the search warrant, their observations supported their belief that the property was being used as a single unit. The property is a row home and from the outside it is not apparent that it is a building with an apartment on each of its 3 floors. *See* Defense Exhibits D-SA-5E. While there appears to be four doorbells on the front door to the property, the doorbells have no names of occupants or apartment designations. N.T. 12/10/2018 at 28; Defense Exhibits D-5R-5T. On the first floor, there are two doors with deadbolt locks. *See* N.T. 12/10/2018 at 28-29; Defense Exhibits D-5U-5V. One door has stairs that lead to the second and third floors. *See* Defense Exhibits D-5CC-5EE. The second and third floors both have doors with deadbolt locks. *See* N.T. 12/10/2018 at 29. However, there are no apartment designations on the doors. *See* Defense Exhibits D-5U-5V, D-5CC-5EE. According to Detective Rodriguez, before the search, police had no information that indicated multiple families were living in the premises. N.T. 12/10/2018 at 36. Likewise, Detective Rodriguez testified that when he entered the property to execute the search

warrant, it was not apparent whether this was a single-dwelling home or a multi-dwelling family home. N.T. 12/10/2018 at 17. In addition, Detective Rodriguez testified that only [Appellant] and one other individual were in the building when the search warrant was executed. N.T. 12/10/2018 at 20.

From the evidence outlined above, it is clear that the Commonwealth established that officers had cause to believe that [Appellant's] residence was being used as a single unit. *See Commonwealth v. Copertino*, 224 A.2d 228, 230 (Pa. Super. 1966).

Trial Court Opinion, 8/16/19, at 6−9.

We have reviewed the testimony and evidence presented at the suppression hearing held on December 10, 2018. Detective Jamal Rodriguez, who obtained and executed the warrant, explained that when Appellant previously was arrested and stopped in a vehicle, the address he provided was "31 East Tulpehocken Street," without specifying an apartment unit. N.T., 12/10/18, at 11−12. Moreover, Detective Rodriguez investigated the property at 31 East Tulpehocken Street, and real estate records revealed that Appellant's mother, Amber Carter, was the owner of the house, described as a "three-story brickmason building" *Id.* at 13−14. The vehicle that Appellant drove on the night of the murder and in which he previously had been stopped was registered to Amber Carter, Appellant's mother, to the same address with no apartment number delineated. *Id.* at 12−13, 20. Rather than having notice that the house was being utilized as multiple apartments, police, based on their investigation, had notice to the contrary; neither Appellant nor his mother indicated an apartment number when providing their addresses to

police or for registration purposes. While Detective Rodriguez reviewed records reflecting that at some point, the house had been subdivided, that information did not indicate that multiple families lived in the house. *Id.* at 35–36; Defense Exhibit D-7.

Appellant's reliance on *In the Interest of Wilks*, 613 A.2d 577 (Pa. Super. 1992), is misplaced. Appellant's Brief at 21. In *Wilks*, the police clearly were aware in advance that the building to be searched had multiple apartments on each floor. Despite that knowledge, the officers improperly sought and obtained a warrant to search the entire "second floor" of the premises. *Wilks*, 613 A.2d at 578–579. In contrast, herein, the officers had no information that multiple families lived in the row home to be searched; in fact, they had information supporting that only one family resided therein.

As our Supreme Court explained in *Commonwealth v. Carlisle*, 534 A.2d 469, 472 (Pa. 1987), the determination of whether an application for a search warrant identified the place to be searched with sufficient particularity requires a practical, common-sense approach. We conclude that Detective Rodriguez's belief that the property "was used as a single-family dwelling," N.T. (Suppression), 12/10/18, at 36, was reasonable based on the information he possessed, when viewed with the required common-sense approach. Moreover, contrary to Appellant's suggestion, without support, that the evidence "established that [Appellant] occupied a separately secured apartment," Appellant's Brief at 21, upon execution of the warrant police found

no evidence of multiple families. There were no names or number designations labeling the doorbells or on the doors to the first and second floors. N.T. (Suppression), 12/10/18, at 17–18, 29–32. The trial court did not err in denying Appellant's suppression motion.

In his final issue, Appellant argues that the trial court erred in denying his request for a mistrial based on a statement by the prosecutor during his closing argument. Appellant's Brief at 27. Initially, we note that the record lacks evidence of a request for a mistrial, but defense counsel did object during the prosecutor's closing argument, and the resulting discussion was held at sidebar and not transcribed. N.T., 12/14/18, at 109. Appellant's entire argument is as follows:

> In this case, the prosecutor stated facts not in evidence, specifically, that the murder weapon, a pink 9 mm Lugar was owned by [Appellant's] mother. While defense counsel promptly objected to this remark and the court promptly issued a curative instruction the damage was done. The prosecutor apparently believed that placing the murder weapon in the hands of [Appellant's] mother provided a crucial evidentiary link that would firmly identify [Appellant] as the shooter without having to rely as heavily as he did on Council's testimony. Despite th[e] court's best efforts, the damage was done and, just as a bell cannot be unrung, what the jury heard could not easily have been put out of mind.

Appellant's Brief at 28.

The Commonwealth asserts that the prosecutor's inference that the gun may have belonged to Appellant's mother was a fair response to the defense's closing argument, during which counsel argued that "[Mr.] Council was the actual shooter, that he had access to guns because he stole his girlfriend's

- 19 -

gun 'just this year,' and that in the surveillance video Council can be seen adjusting his pants consistently with carrying a gun (N.T. 12/14/18, 50-51)." Commonwealth's Brief at 28 (citing **Commonwealth v. Manley**, 985 A.2d 256, 270 (Pa. Super. 2009) (a prosecutor may make fair response to defense arguments)).

"Prosecutorial misconduct does not take place unless the 'unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward [Appellant], thus impeding their ability to weigh the evidence objectively and render a true verdict.'" **Commonwealth v. Holley**, 945 A.2d 241, 250 (Pa. Super. 2008) (quoting **Commonwealth v. Paddy**, 800 A.2d 294, 316 (Pa. 2002)). "In reviewing a claim of improper prosecutorial comment, our standard of review is whether the trial court abused its discretion." **Commonwealth v. Noel**, 53 A.3d 848, 858 (Pa. Super. 2012). When considering such a contention, "our attention is focused on whether [the appellant] was deprived of a fair trial, not a perfect one, because not every inappropriate remark by a prosecutor constitutes reversible error." **Id**. at 858 (citing **Commonwealth v. Lewis**, 39 A.3d 341, 352 (Pa. Super. 2012)). "A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context." **Noel**, 53 A.3d at 858.

In rejecting this issue, we rely on the trial court's explanation, as follows:

> During closing arguments, the prosecutor made the following statement:

[The Commonwealth]: Here's the point I really want to point out. Whose gun is this? Think about this. You got a car full of what [defense counsel] calls hard career criminals. These guys are about showing off and whatever—scary dudes—got criminal records. How many do you think are rolling around with this, a pink gun. I know it's the 21st Century. Do you really think Cedric Council was rolling around with this thing or Mr. Spellman was rolling around with this thing? Why pink? Why pink? Think about this. It's his mom's car, mom's house, mom is in the military. He doesn't have a license to carry a gun, pink gun in a house. Who do you think had a pink gun in there?

N.T. 12/14/2018 at 108-09. An objection was immediately made, and, after a brief side bar, the [c]ourt instructed the jury as follows:

The Court: Folks, there hasn't been any evidence as to the ownership of that gun. Okay. Counsel was arguing what he believes to be an inference from the evidence. Defense counsel disagrees with that. I'm going to direct you to disregard that argument since you haven't heard any evidence as to the ownership of the pink gun. You can consider all of the other arguments, but I direct you to disregard that one. Go ahead.

N.T. 12/14/2018 at 109. Later, after the jury began its deliberations, defense counsel requested that the [c]ourt instruct the jury that a background check revealed that the gun had no registered owner, which the [c]ourt denied. *See* N.T. 12/14/2018 at 145-47.

Here, the Commonwealth was asking the jury to draw an inference from the evidence based on the color of the gun, which was not improper. However, because no evidence had been presented regarding ownership of the gun, in an abundance of caution the [c]ourt sustained [Appellant's] objection and issued a curative instruction, which a jury is presumed to follow. *See* [*Commonwealth v.*] *Freeman*, 827 A.2d [385,] 409 [(Pa. 2003)]. Accordingly, even if the argument was improper, any prejudice that may have arisen from the argument was adequately cured by

- 21 -

the trial court's instruction. *See Freeman*, 827 A.2d at 409; *Commonwealth v. Carter*, 643 A.2d 61, 77 (Pa. 1994) (court's prompt curative instruction was sufficient to avoid any unfair prejudice to defendant); *Commonwealth v. Thornton*, 791 A.2d 1190, 1193 (Pa. Super. 2002) (same).

Trial Court Opinion, 8/16/19, at 17–18.

Our Supreme Court has noted that the trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury. **Commonwealth v. Simpson**, 754 A.2d 1264, 1272 (Pa. 2000). Considering the prosecutor's comments in context, we cannot conclude that the trial court abused its discretion. **Noel**, 53 A.3d at 858. Thus, this issue lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/20